UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARVIN BOWMAN, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:21-CV-03015 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CITY OF CHICAGO BOARD OF | ) | |
| EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

Marvin Bowman, a social studies teacher at a Chicago public high school, claims that—among other things—he received late payments for paid religious holidays, had too many special education students in his classes, and was secretly recorded during class and meetings. R. 1, Compl. at 4–6; R. 5, Am. Compl. at 4–6; R. 82-2, Bowman Dep. at 14, 16–18, 24, 30–33.[1] He says that he faced this treatment because of his religion and because he filed multiple union grievances. Am. Compl. at 4–6. So Bowman brought this suit, alleging that the Chicago Board of Education, his school's principal, and another teacher discriminated, harassed, and retaliated against him. *Id.*[2] Earlier in the case, the individual defendants were dismissed (as well as a damages claim on behalf of his students), *Bowman v. Jones Coleman*, No.

---

[1] Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

[2] The Court has jurisdiction over this Title VII case under 28 U.S.C. § 1331.

1:21-CV-03015, 2021 WL 6113205, at *3–4 (N.D. Ill. Dec. 25, 2021), and the parties then eventually finished discovery.

The Board now moves for summary judgment on what remains of the case, arguing that Bowman fails to provide adequate evidence supporting his claims. R. 80, Def.'s Mot.; R. 81, Def.'s Br. at 1, 8–9. Because the Court agrees and concludes that Bowman does not show—even with the record viewed in his favor—that he faced discrimination, retaliation, or harassment *because of* his religion or union grievances, the motion is granted.

## I. Background

Marvin Bowman has been a social studies teacher at George Corliss High School (a Chicago public school) since 2004. R. 82, DSOF ¶ 1; Bowman Dep. at 9. As a "Bible-Christian," Bowman requests a few schooldays off each year for religious observances. Bowman Dep. at 28:21–23; DSOF ¶ 20; R. 82-11, Timesheet Records. Under the Chicago Board of Education's rules, teachers are allowed "up to three (3) non-attendance days with pay in a school year for the observance of religious holidays, which shall not be considered an absence." DSOF ¶ 8; R. 82-9, Board Rule 4 at 27. Teachers must request these days off in advance through the district's payroll system. DSOF ¶¶ 9–10; R. 82-4, Muhammad Verif. ¶¶ 6–7. The school's principal or clerk reviews and approves the request, and then the district's payroll department processes payment to the teacher for the days off. DSOF ¶¶ 10–11; Muhammad Verif. ¶ 7.

2

But in response to some teachers abusing this benefit, starting in 2018, the payroll department began auditing all requests for paid time off for religious holidays. DSOF ¶ 16; R. 82-5, Cunningham Verif. ¶ 9. For each request, the department refers to a list of major religious holidays, and if the requested day off is not on the list, the department will not process payment for it. DSOF ¶¶ 15–16; Cunningham Verif. ¶¶ 8–9. Instead, the department sends an email to the employee and asks for more information. *Id.* It then works with the Board's law department to decide whether to approve the request. *Id.*; R. 82-10, Sims Dep. at 7–8, 12, 14–15.

For years, Bowman has submitted his requests for days off through the payroll system. But he says that once Ali Muhammad became the interim principal at Corliss High School in 2017, "all of a sudden people started blocking [Bowman's] pay and eventually questioning things about the faith [he] practice[s]." Bowman Dep. at 24. So Bowman submitted a grievance to the Chicago Teachers Union, claiming that he was not paid for two religious holidays that he requested and took off in 2021. DSOF ¶ 64; R. 82-27, 2021 Union Grievance.

In addition to these payroll issues, Bowman also claims that once Muhammad became principal, Bowman's classes began filling up with "unusually high numbers of special needs students." Compl. at 5. The Chicago Teachers Union's collective bargaining agreement requires that no more than 30% of the students in a general education classroom be special education students. (This is referred to by the parties as the "70/30 ratio.") DSOF ¶ 24; R. 82-12, Collective Barg. Agr. at 106. For multiple years, the number of special education students in Bowman's classes exceeded 30%.

3

R. 82-25, Ernesti Letter. So he filed union grievances and a complaint to the Illinois State Board of Education about this imbalance. R. 82-24, Jan. 2020 Union Grievance; R. 82-26, Oct. 2020 Union Grievance; R. 82-28, Ill. State Bd. of Educ. Letter.. Bowman alleges that Muhammad then began retaliating against him for filing these grievances and complaints by further "overpopulating" his classes with special education students. Bowman Dep. at 14.

Bowman also alleges that he faced several other issues at the school. First, he says that Muhammad purposely avoided him at the start of the 2017–18 school year. Bowman Dep. at 11. Second, he asserts that Muhammad turned "the heat up and down to cause extreme temperatures in [Bowman's] classroom" and "manipulate[d]" the temperature based on what Bowman was wearing. R. 82-3, Pl.'s Ans. to Def.'s Interr. ¶ 9; Bowman Dep. at 16–18. Finally, he claims that another teacher, Sheila Jones-Coleman, "secretly videotap[ed]" him and posted a "doctored video" of him onto the school's shared Google Drive. Bowman Dep. at 30–33.

Based on all of this, Bowman brought this suit against the Chicago Board of Education (his employer), principal Muhammad, and teacher Jones-Coleman. Compl. at 1. Because Bowman is a *pro se* litigant, the Court construes his filings expansively. Bowman claims that the Defendants have violated Title VII of the Civil Rights Act of 1964 and the Illinois Human Rights Act by discriminating, harassing, and retaliating against him because of his religion and because he filed grievances about the number of special needs students in his classes. DSOF ¶ 69; Am. Compl. 4–6. The Defendants then filed a partial motion to dismiss, requesting that this Court dismiss the claims

4

against the two individual defendants and strike Bowman's request for damages for his former special needs students. R. 20, Mot. to Dismiss at 1. The Court granted that motion, reasoning that Title VII applies only to employers, not to individuals, and that Bowman does not have standing to sue for damages on behalf of his students. *Bowman*, 2021 WL 6113205 at *3–4. So all that remains in this case are Bowman's Title VII and IHRA claims against the Board.[3]

## II. Legal Standard

In deciding the Board's motion for summary judgment, the Court views the evidence in the light most favorable to Bowman. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011),

---

[3]Claims under the IHRA are treated the same way as claims under Title VII. So throughout this opinion, the Court's analysis of Bowman's Title VII claims also applies equally to his IHRA claims. *See Volling v. Kurtz Paramedic Servs.*, 840 F.3d 378, 383 (7th Cir. 2016).

and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. Discrimination

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). There are two ways for someone to advance past summary judgment on a Title VII employment discrimination claim. The first is satisfying the burden-shifting framework laid out in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). To establish a prima facie case of discrimination under *McDonnell Douglas*, a plaintiff must offer evidence to show that: "(1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from his employer." *Gamble v. Fiat Chrysler Autos. U.S. L.L.C.*, 993

6

F.3d 534, 537 (7th Cir. 2021) (cleaned up).[4] Once the plaintiff has satisfied each element of a prima facie case, "the burden shifts to the employer to offer a nondiscriminatory motive, and if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Id.* (cleaned up). The relevant inquiry is "whether the other employees' situations were similar enough to the plaintiff's that it is reasonable to infer, in the absence of some other explanation, that the different treatment was a result of race or some other unlawful basis." *de Lima Silva v. Wis. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019) (cleaned up).

The second way to get to trial on a Title VII claim is for the plaintiff to offer circumstantial evidence sufficient to allow a reasonable jury to find that he was the victim of discrimination. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2017). The ultimate question is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.*

The Board argues that under either method, Bowman's discrimination claim fails. The Court agrees. For starters, Bowman does not offer evidence to show that he suffered an adverse employment action. A "cognizable adverse employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a

---

[4] This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

significant change in benefits." *Chaudhry v. Nucor Steel-Ind.*, 546 F.3d 832, 838 (7th Cir. 2008) (cleaned up). Though Bowman experienced some inconveniences, none of them caused a significant change in his employment status.

To start, Bowman was not fired, demoted, or disciplined. DSOF ¶ 46; Muhammad Verif. ¶¶ 31–33; Bowman Dep. at 92–93. And he neither had his work schedule changed nor had his pay or benefits decreased. DSOF ¶ 46; Bowman Dep. at 92; Muhammad Verif. ¶¶ 34–35. He claims that after Muhammad became the principal at Corliss High, Bowman started not getting paid for religious holidays that he requested and took off. DSOF ¶ 17; Bowman Dep. at 24. The evidence conclusively shows otherwise. Muhammad approved every one of Bowman's religious holiday requests and never asked him to go unpaid for a requested holiday. DSOF ¶ 19; R. 82-6, Muhammad Dep. at 37, 44; Muhammad Verif. ¶¶ 8–9. And though some of the payments were delayed because the payroll department audited Bowman's requests, he did end up getting paid for all of the days that he requested off. DSOF ¶ 21; Bowman Dep. at 75–76; Cunningham Verif. ¶ 13. So Bowman did not experience an adverse employment action related to his religious holiday pay. *See Lewis v. Wilkie*, 909 F.3d 858, 868 (7th Cir. 2018).

Next, Bowman notes that too many special education students were placed into his classes. Am. Compl. at 4. But that does not qualify either. "A materially adverse employment action is more than a mere inconvenience or an alteration of job responsibilities." *Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1069 (7th Cir. 2012). And although having classes that exceeded the 70/30 ratio may have been challenging for

8

Bowman and may have even increased his workload, it did not "significant[ly] change [his] employment status." *Chaudhry*, 546 F.3d at 838 (cleaned up). In fact, to reduce the burden on Bowman, Muhammad assigned a co-teacher, a special education classroom assistant, *and* a student teacher to Bowman's class. DSOF ¶ 33; R. 82-16, Muhammad 2020 Parent Email at 1–3. That cements that the deviation from the 70/30 ratio was also not an adverse employment action, even when the facts are viewed in Bowman's favor.

As for the rest of Bowman's complaints: he supplies no evidence to support his allegations, and the Board's evidence directly disproves them. Bowman alleges that Muhammad purposefully avoided and ignored him. But Muhammad did no such thing. Muhammad Verif. ¶ 36; Muhammad Dep. at 11. For example, when Bowman reached out to Muhammad about the 70/30 ratio issue, Muhammad engaged with him and asked for his suggestions on how to better support him. R. 82-15, Muhammad 70/30 Ratio Email at 1–2. Bowman also claims that Muhammad manipulated the temperature in Bowman's classroom to antagonize him. Bowman Dep. at 16–17. Again, that speculation is not based on personal knowledge. Muhammad had no control over the heating and cooling systems at the school; those were managed by the building engineer and the facilities department. Muhammad Verif. ¶¶ 24, 26; Muhammad Dep. at 56–59. And when Bowman told Muhammad about the temperature fluctuations, Muhammad asked the facilities department to address it and then even offered to switch Bowman to a different classroom. Muhammad Verif. ¶¶ 25–26; Muhammad Dep. at 58–59.

Finally, Bowman contends that another teacher secretly recorded him and then posted a doctored video of him on the school's Google Drive. Bowman Dep. at 30–32. But the Board explains, without contradiction, that during the pandemic, when Corliss High School was conducting classes remotely, the school generally recorded all classes and staff meetings. DSOF ¶ 58; Muhammad Verif. ¶ 29; Muhammad Dep. at 50. The video platform would notify all attendees verbally and in writing that it was recording the class or meeting, and then it would automatically send them a copy of the recording. *Id.* Bowman simply does not offer evidence to rebut that no teachers or other Board employees ever secretly recorded Bowman or doctored a video of him. Muhammad Verif. ¶ 30; Muhammad Dep. at 49. So Bowman did not suffer an adverse employment action.

But even if the delayed payments and increased number of special education students did qualify as adverse employment actions, Bowman's claim would still lose because he provides no concrete evidence that other employees at Corliss High School were treated better than him. Plus, the undisputed evidence shows they were not.

Bowman's delayed pay for religious holidays was not at all unique to him. The payroll department treated his religious holiday requests the same way it treats all teachers' requests. Cunningham Verif. ¶¶ 6–13. Under the school district's policies, a teacher must submit a written request for a religious holiday to his school's principal at least two days in advance. Cunningham Verif. ¶ 4. Once the principal approves the request, it is sent to the payroll department. Cunningham Verif. ¶¶ 4–5. The department then reviews each request on a case-by-case basis to determine if it qualifies for

10

paid time off. Specifically, if the requested day off is not on the payroll department's list of major holidays, the department emails the employee and asks for more information. DSOF ¶¶ 15–16; Cunningham Verif. ¶¶ 8–9. It then works with the Board's law department to decide whether to approve the request. *Id.*; Sims Dep. at 7, 8, 12, 14–15. Unsurprisingly, this review process results in delayed payments for non-major religious holiday requests. So the questioning and delayed payments that Bowman experienced were just standard procedure. All teachers, including those who are not Bible Christians like Bowman, are subject to the same process for religious holiday requests.

Similarly, Bowman was (unfortunately) far from the only teacher with excessive numbers of special education students in his class. Corliss High School as a whole has struggled for years to maintain the 70/30 ratio. Muhammad Verif. ¶ 14; Muhammad Dep. at 13, 20, 32. Bowman's own evidence shows that dozens of classes at Corliss were comprised of more than 30% special education students and that many teachers had even higher percentages of those students than Bowman did. R. 89, Exh. 29, Class Rosters. So again, teachers outside of Bowman's protected religious class did not receive better treatment than he did.

That said, even if Bowman had established a prima facia case of employment discrimination, which would shift the burden to the Board to provide nondiscriminatory motives for its actions, the Board more than carries that burden. It first explains that it began its policy of auditing all religious holiday requests because some teachers throughout the district were abusing the ability to take these days off. Def.'s Br.

11

at 11–12; Cunningham Verif. ¶ 9. That is a legitimate, nondiscriminatory reason for reviewing and delaying payment for Bowman's religious holiday requests. And the record supports that explanation. Cunningham Verif. ¶ 9.

The Board then notes that Bowman's classes exceeded the 70/30 ratio because Corliss High School is a neighborhood school (that means that any child from the surrounding area may attend) and the neighborhood that it is in has a high percentage of special education children. Def.'s Br. at 12; Muhammad Verif. ¶ 3; R. 82-13, Lofton Dep. at 31:2–5. Plus, Corliss is a small school, and because the district provides school budgets based on student population size, Corliss could not hire more teachers to spread special education students across numerous class sections for a particular subject. Lofton Dep. at 31:2–17. Given these constraints, Muhammad submitted waiver applications to the Illinois State Board of Education, asking it to waive the 70/30 ratio requirement for classes that did not comply (including Bowman's). Muhammad Verif. ¶¶ 15–16, 22; Lofton Dep. at 31:18–23. Again, that is all supported by the evidence and provides valid, nondiscriminatory reasons for the school placing more special education students in Bowman's classes. Moreover, Bowman provides no evidence that shows that the Board delayed his payments or put more special education students in his classes *because of* his religious beliefs. So he fails to establish any connection between his protected class status and the alleged adverse employment actions. That is yet another reason that Bowman's discrimination claim fails.

### B. Retaliation

Title VII also bars employers from retaliating against their employees for complaining about discrimination. 42 U.S.C. § 2000e-3(a). For his retaliation claim to survive summary judgment, Bowman must show that a reasonable jury could find that (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) the adverse action was motivated by the protected activity. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). But the standard for what counts as an adverse employment action here is different than it is for discrimination claims. An adverse action for retaliation purposes "need not be one that affects the terms and conditions of employment." *Lewis*, 909 F.3d at 867 (cleaned up). Instead, courts simply ask whether the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016). Having said that, Title VII does not set forth a "general civility code for the American workplace," so "petty slights, minor annoyances, and bad manners" do not qualify as materially adverse actions. *Id.*

Despite this lower standard for adverse actions for retaliation claims, Bowman's retaliation claim still fails because he does not offer evidence showing that the adverse actions he suffered were motivated by his protected activities. Bowman alleges that Muhammad retaliated against him for filing union grievances about having too many special education students in his classes. Am. Compl. at 4–6. He suggests that in retaliation, Muhammad blocked or delayed his pay for religious holidays and "overcrowded" his classes with even more special education students. *Id.* But

13

again, Bowman offers no evidence that Muhammad or the Board took those actions *because* he filed union grievances. And Bowman does not counter the Board's evidence that its motives for the actions were legitimate and non-retaliatory.

As discussed above, undisputed evidence shows that Bowman's payments were delayed (not blocked or denied) because his requests were audited as per the payroll department's standard protocol for all teachers' religious holiday requests. Cunningham Verif. ¶¶ 6–13.. And the audit policy was instituted because some teachers were abusing the benefit. Cunningham Verif. ¶¶ 8–9; Sims Dep. at 7, 8, 12, 14–15. Likewise, the record establishes that Bowman's classes had too many special education students in them because Corliss High School as a whole—due to its size and neighborhood population—struggled to maintain the 70/30 ratio. Muhammad Verif. ¶ 14; Muhammad Dep. at 13, 20, 32; Lofton Dep. at 31:2–17. So neither the delayed payments nor the increased number of special education students were retaliatory actions in response to Bowman filing union grievances. Thus, regardless of whether he satisfies the first two elements of the test for retaliation claims, Bowman's claim fails because he does not tie the alleged adverse actions to his protected activity.

### C. Harassment

The same goes for Bowman's harassment claim; he fails to connect the harassment he allegedly faced to his religion or any other protected characteristics. A harassment or hostile-work-environment claim "requires proof of four elements: (1) the plaintiff's workplace was both subjectively and objectively offensive; (2) the plaintiff's [protected category] was the cause of the harassment; (3) the harassment was severe or pervasive; and (4) there is a basis for employer liability." *Lord*, 839 F.3d at 561.

Like with retaliation, whether or not Bowman satisfies other prongs of this test, he does not show that he was harassed *because* he is a Bible Christian. As previously discussed, the evidence reveals that all of the Board's actions that might qualify as harassment were caused not by Bowman's religious identity, but rather by legitimate, unrelated factors. The closest call is the Board's delay in paying Bowman for his requested religious holidays, but that too does not satisfy the causation requirement. Once again, all teachers' religious holiday requests were audited, and all payments for non-major religious holidays were delayed and subject to follow-up questions. Cunningham Verif. ¶¶ 6–13. So Bowman was not targeted or harassed for being a Bible Christian—he just experienced the same payment delays that plenty of teachers faced, including many outside of Bowman's protected category. Cunningham Verif. ¶¶ 8–9; Sims Dep. at 7, 8, 12, 14–15. And he provides no evidence to the contrary. Bowman's harassment claim—like his others—does not survive summary judgment.

15

## IV. Conclusion

The Court grants the Board's motion for summary judgment, R. 80, and the case is dismissed with prejudice.

ENTERED:

s/Edmond E. Chang

Honorable Edmond E. Chang
United States District Judge

DATE: September 27, 2024